UNITED STATES DISTRICT COURT
NORTHER DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| JOHN UNDERHILL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:05-CV-196-TS |
| | ) | |
| CSX TRANSPORTATION, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION**

This matter is before the Court on the Defendant's motion for partial summary judgment of the Plaintiff's Safety Appliance Act claim. The Plaintiff, John Underhill, worked for the Defendant, CSX, as an engineer and claims that he was injured setting a handbrake on a locomotive. The Plaintiff filed a Complaint that included a claim under the Federal Employer's Liability Act ("FELA") and the Federal Safety Appliance Act ("FSAA"). The Defendant argues summary judgment on this claim is appropriate because the FSAA applies only to locomotives that are in use, and the locomotive was not in use when it allegedly caused the Plaintiff's injury. For the reasons stated below, the Defendant's motion is denied.

**A.      Summary Judgment Standard**

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "In other words, the record must reveal that no reasonable jury could find for the nonmoving party." *Dempsey v.*

*Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted). After adequate time for discovery, summary judgment must be given against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994); *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986); *Doe*, 42 F.3d at 443.

**B.     Facts and Procedural Background**

On July 13, 2004, the Plaintiff was a CSX engineer working at a CSX yard in Garrett, Indiana. Locomotive 1507 was standing connected to another locomotive the Plaintiff needed for that day's jobs. Neither locomotive was running. The Plaintiff separated locomotive 1507 from the other locomotive by separating all hoses, chains, and cables connecting the two locomotives. He had no plan to use Locomotive 1507 that day for anything else, and it sat on a "rip" track, a track used for repairs. The rip track is often used to hold non-defective, functioning locomotives. The rip track it was on had not been "blue flagged," or flagged as a portion of track containing disabled or

2

unrepaired equipment.

After separating the locomotives, the Plaintiff went to set the handbrake on Locomotive 1507, as CSX operating rules require that handbrakes be applied on engines left unattended. While attempting to set the handbrake, it released, causing injury to his back. The Plaintiff finished his 12-hour shift, having no further contact with locomotive 1507. He did not report the handbrake problem to the yardmaster or the CSX mechanical department. Locomotive 1507 was not under repair on July 13, 2004. It had been inspected and repaired in Maryland on June 23–26. The engine was used for a run on July 14, 2004.

The Plaintiff filed suit on May 13, 2005, in the Northern District of Illinois. His Complaint asserted several claims, including one for "putting a vehicle in service which was not equipped with an efficient handbrake" in violation of the Safety Appliance Act as encoded in 49 U.S.C. § 20302(a)(1)(B). (Complaint 3; DE 1.) On June 8, 2005, this case was transferred to this Court. On October 31, 2005, the Defendant moved for summary judgment on the FSAA claim. The Plaintiff responded on January 3, 2006, and the Defendant replied on January 13.

**C.   Standard for Liability under the FSAA and FELA**

The FSAA sets out requirements a vehicle must meet for a railroad carrier to use the vehicle on any of its railroad lines. The applicable provision states that "a railroad carrier may use or allow to be used on any of its railroad lines—(1) a vehicle only if it is equipped with . . . efficient handbrakes . . . ." 49 U.S.C. § 20302. The FSAA creates an absolute duty on the railroad; a railroad is liable for injury resulting from a violation of the FSAA, even if the railroad was not negligent. *Lisek v. Norfolk and Western Ry. Co.*, 30 F.3d 823, 825–26 (7th Cir. 1994). "In other words, 'a

3

failure of equipment to perform as required by the [FSAA] is in itself an actionable wrong, in no way dependent upon negligence and for the proximate results of which there is liability—a liability that cannot be escaped by proof of care or diligence.'" *Id.* (quoting *O'Donnell v. Elgin, Joliet, & E. Ry. Co.*, 338 U.S. 384, 390 (1949)). FELA allows employees harmed by violations of the FSAA to sue for damages, as the FSAA itself does not provide workers a remedy. *Id.*; 45 U.S.C. § 51.

The FSAA provision regarding handbrakes is only violated when a railroad carrier uses or allows to be used on its railroad lines a vehicle with faulty handbrakes. *Brady v. Terminal R.R. Ass'n*, 303 U.S. 10, 13 (1938); *Lyle v. Atchison, Topeka, & Santa Fe Ry. Co.*, 177 F.2d 221, 222 (7th Cir. 1949) ("[W]hen a locomotive or car is in 'use on the line,' the mandatory duty of the carrier attaches and when the car or engine is not so in use then the duty under the express provision of the statute does not exist."). When determining whether a vehicle was in use, courts often look to interpretation of an identical "in use" requirement in a similar statute, the Federal Boiler Inspection Act, which was recodified in 1994 as the Locomotive Inspection Act, at 49 U.S.C. § 20701.[1] *Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 288 n.2 (4th Cir. 1999). The determination of whether the vehicle was in use at the time of the accident is a question of law for the Court to decide. *Carder v. Ind. Harbor Belt R.R.*, 205 F. Supp. 981, 984 (N.D. Ind. 2002) (collecting cases).

---

[1] 49 U.S.C. § 20701 states as follows:
A railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances—

(1)   are in proper condition and safe to operate without unnecessary danger of personal injury;

(2)   have been inspected as required under this chapter and regulations prescribed by the Secretary of Transportation under this chapter; and

(3)   can withstand every test prescribed by the Secretary under this chapter.

49 U.S.C. § 20701.

4

The Defendant argues the FSAA does not apply because Locomotive 1507 was not in use when the Plaintiff injured his back. The Defendant views the case law as establishing two competing tests to determine whether a rail vehicle is in use. The Fifth Circuit established a bright line rule in *Trinidad v. Southern Pacific Transportation Co.*, 949 F.2d 187 (5th Cir. 1991), that a train is considered in use only after it has been fully assembled and pre-departure inspection has occurred. The other test was established in the Fourth Circuit cases *Deans v. CSX Transportation Inc.*, 152 F. 3d 326 (4th Cir. 1998), and *Phillips v. CSX Transportation*, 190 F.3d 285, and looked to the totality of the circumstances—especially the location of the vehicle and the activity of the injured party—when determining whether the vehicle was in use. The Defendant concludes that under either test, Locomotive 1507 was not in use because it was located on the repair track and the Plaintiff was not using the locomotive that day.

The Plaintiff disagrees with this analysis and points to other cases calling into doubt the cases the Defendant relies on. The Plaintiff argues that the statute considers a rail vehicle to be in use unless the vehicle is taken out of use for repair, service, or maintenance.

The law addressing when a rail vehicle is in use under § 20302 is unsettled. The Seventh Circuit has addressed whether a rail vehicle was in use under the Boiler Inspection Act, and those cases do not exclude either the Defendant's interpretation or the Plaintiff's, though as stated below, they lend more weight to the Plaintiff's arguments. *See infra* 11–12. The Seventh Circuit has not ruled on when a vehicle is in use under § 20302, and the district court cases from this circuit are in disagreement. The Southern District of Indiana's decision in *Frazier v. CSX Transportation, Inc.*, Civil Action No. 3:03-CV-81-RLY-WGH, (Def. Ex. 2), involved a very similar set of facts to this case and used the Defendant's suggested analysis to find the rail vehicle was not in use. Because the

rail vehicle was not going to be used as a part of a train and the worker injured was a yard worker, the court relied on *Phillips* to find the rail vehicle was not in use. The Northern District of Illinois's opinion in *Robb v. Burlington Northern And Santa Fe Railway Co.*, 100 F. Supp. 2d 867 (N.D. Ill. 2000), also involved a similar set of facts, and the *Robb* court considered and rejected an argument similar to the one advanced by the Defendant and held the rail vehicle was in use. The *Robb* court held that the plain language of the statute, its purpose, and Supreme Court precedent interpreting the statute required it to hold that the train was in use because a narrower interpretation would defeat the purpose of the statute: to protect workers injured while using the handbrake during routine switching operations. Considering the text of the statute and the Supreme Court cases interpreting the statute, this Court finds the Plaintiff's interpretation and the one followed in *Robb* to be the correct interpretation.

The FSAA sets out safety requirements for rail "vehicles" and separate requirements for "trains," that is, a line of vehicles connected behind a locomotive. A railroad carrier is allowed to use a "vehicle" on its lines only if it is equipped with a specific type of coupler, secure sill steps, efficient handbrakes, and secure ladders and running boards. 49 U.S.C. § 20302(a)(1–3). A "locomotive" may only be used if it is equipped with a "power-driving wheel brake and appliances for operating the train-brake system." 49 U.S.C. § 20302(a)(4). A railroad carrier is allowed to use a "train" on its lines only if the train includes a sufficient number of vehicles equipped with power or train brakes. 49 U.S.C. § 20302(a)(5). Thus, under the FSAA, there are separate "in use" inquiries depending on whether the usage of a vehicle, locomotive, or train is at issue. It is clear that "the FSAA makes a distinction between trains, which are stopped with the use of air-brakes, and cars, which are stopped with the use of handbrakes." *Synar v. Union Pac. R.R. Co.*, 2001 WL 1263573,

at *15 (Tx. Ct. App. Oct. 17, 2001). Though the language of the statute has changed somewhat since the case was decided, this distinction between vehicles, locomotives, and trains was noted by the Supreme Court in *United States v. Erie R.R. Co.*, 237 U.S. 402, 407–08 (1915):

> [T]he air-brake provision deals with running a train, while the other requirements relate to hauling or using a car. In one a train is the unit and in the other a car. As the context shows, a train in the sense intended consists of an engine and cars which have been assembled and coupled together for a run or trip along the road. When a train is thus made up and is proceeding on its journey it is within the operation of the air-brake provision. But it is otherwise with the various movements in railroad yards whereby cars are assembled and coupled into outgoing trains, and whereby incoming trains which have completed their run are broken up. These are not train movements, but mere switching operations, and so are not within the air-brake provision. The other provisions calling for automatic couplers and grab irons are of broader application and embrace switching operations as well as train movements, for both involve a hauling or using of cars.

*Erie R. Co.*, 237 U.S. at 407–08. According to the Supreme Court, because a train is an assembly of train cars, or vehicles, the train does not exist until assembly is complete, that is, after switching operations have finished. Thus, safety requirements applicable to trains do not apply during switching operations. However, safety requirements applicable to rail vehicles do apply during switching operations, because switching operations necessarily involve the "use" of rail vehicles.

Because this case involves a safety requirement that is applicable to rail vehicles—that a vehicle may only be used if it is equipped with efficient handbrakes—the question is whether this vehicle was in use and cases deciding whether a train was in use have limited relevance. One case relied on by the Defendant, *Trinidad*, is a case involving the use of a train, not a vehicle. In *Trinidad*, a worker was injured during final steps of an inspection of a train's air brakes. The court correctly stated that "courts have not applied the [FSAA] to trains involved in switching operations—those procedures by which the cars and engines are uncoupled, moved, and reassembled—even though such trains are in motion," and attempted to determine whether the inspection was part of switching

7

operations or within the post-departure category. *Trinidad*, 949 F.2d at 188–89. Because the train had not yet passed pre-departure inspection, the court held that the train was not in use. *Id.* Contrary to the Defendant's argument, *Trinidad* does not apply to this case because this case does not involve the question of whether a train was in use; the question here is whether a vehicle was in use.

The Fourth Circuit cases cited by the Defendant, *Deans* and *Phillips*, did involve FSAA requirements applicable to rail vehicles. However, those opinions applied cases such as *Trinidad* that involved the question of when a train was in use. In *Deans*, the plaintiff was releasing handbrakes on vehicles so that the train could depart and was injured when one vehicle's handbrake failed to work correctly. *Deans*, 152 F.3d at 328. The pre-departure inspection was not yet complete, though the inspection had nothing to do with the handbrake and could have been completed before the handbrakes were released. The court considered the *Trinidad* case, even though that case dealt with whether a train was in use. The *Deans* court rejected the opinion in *Trinidad* because it thought the train was in use even though it had not yet passed pre-departure inspection. *Id.* at 328–29. The *Deans* court stated that whether a train is in use depends on all the facts, especially the location of the train and the activity of the party that led to injury. *Id.* at 329–30.

*Phillips* followed *Deans* in failing to distinguish the inquiry of whether a train is in use from that of whether a rail vehicle is in use. *Phillips* involved a plaintiff injured while engaging a rail vehicle's handbrake during switching operations. *Phillips* at 286–87. The court held that the rail vehicle was not in use because "the FSAA does not apply to train cars involved in switching operations." *Id.* at 289 (citing *United States v. Seaboard Air Line R.R.*, 361 U.S. 78 (1959); *United States v. N. Pac. Ry. Co.*, 254 U.S. 251 (1920); and *Trinidad*, 949 F.2d 197). Convincing arguments have been made by other courts that this statement is not correct, and that the Supreme Court's

8

distinction in *Erie*, quoted above, is still good law. *See Synar v. Union Pac. R.R. Co.*, 2001 WL 1263573, at *16 (Tex. App. Oct. 17, 2001) ("The *Phillips* court broadly stated that 'the FSAA does not apply to train cars involved in switching operations' and cited three cases, none of which stand for that proposition."); *see also Hoemmelmeyer v. CSX Transp., Inc.*, 2005 WL 2124259, at *5 (S.D. Ohio Aug. 30, 2005) ("[F]rom the inception of the FSAA, the safety of railroad workers involved in switching operations was clearly the object of Congress. Clearly, Supreme Court and lower court precedent demonstrates this is the case.") (citing cases).

However, the Defendant states that it is not arguing that rail vehicles are not in use during switching operations. Rather, the Defendant argues that applying the totality of the circumstances test as stated in *Deans* and *Phillips* results in a conclusion that the rail vehicle was not in use. The problem is that both *Deans* and *Phillips* considered factors that are only relevant to determining when a train is in use, and have little application when determining whether a rail vehicle is in use. For example, both cases looked at whether departure of a train was imminent. *Deans*, 152 F.3d at 330; *Phillips*, 190 F.3d at 289–90. This factor has no application as to whether a vehicle was in use, as a plain understanding of the word "use" suggests a vehicle used to assemble a train is in use, whether the train is about to leave or not. The factors cited as most important by *Deans* and *Phillips*, the activity of the party when he was injured and the location of the train or vehicle, are important factors, but must be considered in the context of the use of a vehicle, not the use of a train.

When interpreting the FSAA to determine whether it applies to a set of facts, the Supreme Court has looked to whether the applying the statute would serve Congress's purpose in enacting the law. *United States v. Chicago, Baltimore & Qunicy R.R. Co.*, 237 U.S. 410, 412 (1915); *Seaboard Air Line*, 361 U.S. at 82–83. The purpose of the FSAA was to protect railroad workers

9

from injury and death, and the Supreme Court has said the Act should be "liberally construed as a safety measure." *Seaboard Air Line*, 361 U.S. at 83. The handbrake provision is "ascribable to the necessity of controlling the movement of cars in yards and elsewhere, when trains have been broken up or are being made up." *United States v. Great N. Ry. Co.*, 229 F. 927, 930 (9th Cir. 1916). "[T]he purpose of the 'in use' limitation is to give railcar operators the opportunity to inspect for and correct safety appliance defects before the FSAA exposes the operators to strict liability for such defects." *Phillips*, 190 F.3d at 288. "[T]he intent of the statute is to exclude from its coverage only such functions as are necessary to detect and correct those defective conditions for which absolute liability will be imposed." *Angell v. Chesapeake & Ohio Ry. Co.*, 618 F.2d 260, 262 (4th Cir. 1980).

In light of the purposes behind the FSAA and the statute's use language and efficient handbrakes requirement, the Court interprets § 20302's efficient handbrake requirement to apply to all rail vehicles that are not being serviced, maintained, inspected, repaired, or otherwise being made ready for use. The handbrakes are frequently used during switching operations and at other times to hold rail vehicles in place and it would make little sense to interpret the FSAA so that the handbrake requirements did not apply when the handbrakes are used most, and their impact on worker safety the greatest. *See Robb*, 100 F. Supp. 2d at 870 ("It is precisely because safety in the yard during switching operations calls for efficient handbrakes that can stop cars and other vehicles that Congress passed the handbrake provision."). Also, there is nothing in the text of the statute to suggest only some classes of employees were meant to be protected by the safety requirements. What is important in determining whether a rail vehicle was in use was the activity the worker was engaged in when injured. The location of the vehicle may also show whether a vehicle was being repaired or maintained.

This interpretation is consistent with other cases from this Circuit. In *Lyle v. Atchison, Topeka & Santa Fe Railway Co.*, 177 F. 2d 221 (1949), the Seventh Circuit considered whether a locomotive was in use under the Boiler Inspection Act. An employee was injured when he slipped while climbing down from a locomotive after he had completed his duties in servicing the locomotive by lubricating, cleaning, and adding sand, water, and fuel. When the injury occurred, the locomotive was located in an inspection pit, near the roundhouse. The Seventh Circuit held that the locomotive was not in use, because the plaintiff was the person who was in charge of servicing and cleaning the locomotive, and "[t]o service an engine while it is out of use, to put it in readiness for use, is the antithesis of using it." *Id.* at 223.

*Tisneros v. Chicago & North Western Railway Co.*, 197 F.2d 466 (1952), considered whether a locomotive was in use under the Boiler Inspection Act when it was taken to a stall in a roundhouse and an employee was injured while checking to see what he needed to do to get the engine ready for another run. He slipped on the ladder and sued. The *Tisneros* court held that the locomotive was not in use, and cited *Lyle* for the proposition that an engine is not in use when it is being serviced to get it ready for use. *Id.* at 467–68 (citing *Lyle*, 177 F.2d at 222–23).

Two recent district court cases are also consistent with this interpretation of the in use requirement. *Vander Zanden v. Norfolk & Western Railway Co.*, 1996 WL 699604 (N.D. Ill. Nov. 27, 1996) held that an engine was in use when a worker injured himself while entering a locomotive to turn it on, because the locomotive was "not in the roundhouse, or otherwise being serviced," and a narrower reading of the in use requirement would "unjustifiably undermine the protective function of the Act." *Id.* at *3. *Carder v. Indiana Harbor Belt Railroad*, 205 F. Supp. 2d 981(N.D. Ind. 2002), another case involving the Boiler Inspection Act, held that a locomotive was not in use because an

11

employee was injured while investigating why a locomotive was not running properly and because it was on a section of track that was blue-flagged—flagged so that other workers would know the equipment is being worked on. *Id.* at 984–86.

With the exception of the unpublished decision in *Frazier*, this Court has found no other cases in this Circuit that contradicts this Court's interpretation of the in use requirement: that a rail vehicle is in use under § 20302 unless the vehicle is being serviced, inspected, repaired, maintained, or otherwise in the process of being made ready for use.

### D. Whether the Plaintiff Was Injured on Locomotive 1507 While It Was In Use

Applying § 20302 and the law interpreting the statute as it applies to vehicles, the Court finds Locomotive 1507 was being used when the Plaintiff was injured setting the handbrake. There is no evidence Locomotive 1507 was on a repair track because it was being repaired, serviced, or maintained. The Plaintiff was a transportation worker who needed the locomotive to which Locomotive 1507 was attached. He separated the locomotives and attempted to set the handbrake on Locomotive 1507. His purpose in setting the handbrake was to keep the vehicle in place on the line. He was not inspecting the locomotives for damage or doing anything to prepare the vehicles for use. Locomotive 1507 was included in a train the following day. There is no evidence showing the vehicle was removed from use at the time the Plaintiff was injured.

The Defendant's argument that the locomotive was not in use depends on an unjustifiably narrow reading of the statute's text. The Court declines to adopt this narrow interpretation; a plain reading of the statute's text and Supreme Court precedent requires the conclusion that this locomotive was required to have efficient handbrakes while it was in use on the railroad's lines at

12

the time the Plaintiff was injured.

## ORDER

For the reasons stated above, the Defendant's motion [DE 19] is DENIED.

SO ORDERED on April 24, 2006.

        /s/ Theresa L. Springmann  
        THERESA L. SPRINGMANN  
        UNITED STATES DISTRICT COURT